ORDERED.

**Dated:  June 20, 2018**

Caryl E. Delano
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In Re: | Chapter 7 |
| | |
| FRANK MICHAEL MONGELLUZZI; | CASE NO. 8:11-bk-01927-CED |
| ABLE BODY TEMPORARY SERVICES, INC.; | CASE NO. 8:13-bk-06864-CED |
| PROFESSIONAL STAFFING - A.B.T.S., INC.; | CASE NO. 8:13-bk-06866-CED |
| WESTWARD HO II, LLC; | CASE NO. 8:13-bk-06867-CED |
| WESTWARD HO, LLC; | CASE NO. 8:13-bk-06868-CED |
| YJNK II, INC.; | CASE NO. 8:13-bk-06869-CED |
| YJNK XI CA, LLC; | CASE NO. 8:13-bk-06875-CED |
| ABTS HOLDINGS, LLC; | CASE NO. 8:13-bk-06879-CED |
| ABLE BODY GULF COAST, INC.; | CASE NO. 8:13-bk-06881-CED |
| CECIL B. DEBOONE, LLC; | CASE NO. 8:13-bk-06883-CED |
| PREFERABLE HQ, LLC; | CASE NO. 8:13-bk-06891-CED |
| ROTRPICK, LLC; | CASE NO. 8:13-bk-06894-CED |
| TRAINING U, LLC; | CASE NO. 8:13-bk-06896-CED |
| USL&H STAFFING, LLC; | CASE NO. 8:13-bk-06897-CED |
| ORGANIZED CONFUSION, LLP; | CASE NO. 8:13-bk-06888-CED |
| YJNK III, INC.; and | CASE NO. 8:13-bk-06899-CED |
| YJNK VIII, LLC, | CASE NO. 8:13-bk-06902-CED |

      Debtors.
_____/

| | |
|---|---|
| ANGELA WELCH and | ADV. PRO. NO. 8:14-ap-00653-CED |
| CHRISTINE HERENDEEN, | **Lead Case** |
| as Chapter 7 Trustees, | ADV. PRO. NO. 8:15-ap-00111-CED |
| | ADV. PRO. NO. 8:15-ap-00112-CED |
|     Plaintiffs, | ADV. PRO. NO. 8:15-ap-00113-CED |
| | ADV. PRO. NO. 8:15-ap-00114-CED |
| | ADV. PRO. NO. 8:15-ap-00115-CED |

ADV. PRO. NO. 8:15-ap-00116-CED
ADV. PRO. NO. 8:15-ap-00117-CED
ADV. PRO. NO. 8:15-ap-00118-CED
ADV. PRO. NO. 8:15-ap-00119-CED
ADV. PRO. NO. 8:15-ap-00120-CED
ADV. PRO. NO. 8:15-ap-00121-CED
ADV. PRO. NO. 8:15-ap-00122-CED
ADV. PRO. NO. 8:15-ap-00123-CED
ADV. PRO. NO. 8:15-ap-00124-CED
ADV. PRO. NO. 8:15-ap-00125-CED
ADV. PRO. NO. 8:15-ap-00126-CED

v.

REGIONS BANK,

     Defendant.
_____/

## MEMORANDUM OPINION
## GRANTING IN PART AND DENYING IN PART
## PLAINTIFF'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT
### (Doc. Nos. 335, 336, 337, and 360)

In four of these administratively consolidated adversary proceedings,[1] Plaintiff, Chapter 7 Trustee Christine Herendeen, ("Plaintiff") has moved for partial summary judgment on Counts IV and VII of her complaints (the "Complaints") and on the Ninth and Twelfth Affirmative Defenses asserted by Defendant Regions Bank ("Regions") (the "Summary Judgment Motions"). For the reasons set forth below, the Court will grant the Summary Judgment Motions in part and deny them in part.

## I.    FACTS

The basic facts are not in dispute. Together, Frank and Anne Mongelluzzi owned about 100 corporations and limited liability companies (the "Mongelluzzi Entities"). A number of the Mongelluzzi Entities were engaged in the temporary staffing industry (the "Able Body Entities"). The

---

[1] Rotrpick, LLC - Adv. Pro. No. 8:15-ap-00117-CED; YJNK VIII, Inc. - Adv. Pro. No. 8:15-ap-00122-CED; Training U, LLC - Adv. Pro. No. 8:15-ap-00123-CED; and YJNK XI CA, LLC - Adv. Pro. No. 8:15-ap-00124-CED. *See Order Consolidating Adversary Proceedings for Administrative and Discovery Purposes Only*, Doc. No. 200. Unless otherwise stated, all references to the docket are to the docket in lead case, Adv. Pro. No. 8:14-ap-00653-CED.

Summary Judgment Motions relate to four of the Able Body Entities: Rotrpick, LLC ("Rotrpick"), YJNK XI CA, LLC ("YJNK XI"), YJNK VIII, Inc. ("YJNK VIII"), and Training U, LLC ("Training U") (together, "Debtors").

### A.    The Regions Bank Transactions and Subject Transfers

Many of the Mongelluzzi Entities maintained bank accounts at Regions. These accounts (the "Mongelluzzi Accounts") included Debtors' bank accounts at Regions (the "Debtor Accounts"). Regions also made loans to the Mongelluzzis and some of the Mongelluzzi Entities. Regions' loans included a $7.5 million revolving line of credit between Regions and some of the Mongelluzzi Entities and two of the Able Body Entities,[2] as well as ten other loans (together, the "Regions Loans"). Debtors were not borrowers on any of the Regions Loans and did not guaranty any of the Mongelluzzis' or other Mongelluzzi Entities' obligations under the Regions Loans.

Prior to the transfers that are the subject of these adversary proceedings, the unpaid balance on the Regions Loans was approximately $15 million.[3] The assets of the Mongelluzzi Entities were also encumbered by loans made by Synovus Bank, which totaled approximately $42 million.[4]

Starting in 2009, Regions became concerned about the frequency and amount of overdrafts within the Mongelluzzi Accounts.[5] On June 28, 2010, Regions' fraud prevention department flagged some of the Mongelluzzi Accounts as suspicious for a possible check-kiting scheme and issued a check-kiting report.[6] That same day, the fraud prevention department sent an email to Regions' management notifying them of the suspicious activity.[7]

---

[2] PreferAble People, LLC, and Able Body Temporary Services, Inc.
[3] Doc. No. 209, p 24-25.
[4] Adv. Pro. No. 8:14-ap-00645-CED, Doc. No. 158, ¶ 62.
[5] Doc. No. 240, p. 6.
[6] Heren_00304166 to Heren_0030499 (filed under seal pursuant to the *Amended Confidentiality Protective Order*, Doc. No. 282).
[7] *Id.*

Two days later, on June 30, 2010, Regions' monitoring and reporting operations department confirmed the fraudulent check-kiting activity.[8] Regions' investigation revealed that within the six days prior to June 30, 2010, suspect deposits totaling $6,065,702.30 had been made to the Mongelluzzi Accounts.[9]

On June 30, 2010, Regions decided to terminate its banking and lending relationship with the Mongelluzzis and the Mongelluzzi Entities. Over the next two days, Regions froze all the Mongelluzzi Accounts, including the Debtor Accounts.[10] On the date of the freeze, funds on deposit in the Mongelluzzi Accounts totaled approximately $12.4 million, including over $7.4 million in the Debtor Accounts.[11]

Regions wanted to apply the funds in the Mongelluzzi Accounts, including the funds on deposit in the Debtor Accounts, to the outstanding balances on the Regions Loans. On July 12, 2010, Regions' employees engaged in a remarkable set of emails with its outside attorneys (the "Emails"). One of Regions' attorneys advised Regions that it could be liable for fraudulent transfers if it took funds from the Debtor Accounts:

> We are facing a real Hobson's Choice here. Based upon our discussions, we understand that Regions wants to [be] paid off. The problem is that some of the funds to be used for the Preferable People payoff may be coming from some of Borrower's affiliates ("Transferors") instead of Borrower. If the Transferors end up in bankruptcy, Regions may be liable to give some or all of the payoff amount back to the Transferors as a voidable transfer (i.e., a fraudulent transfer).[12]

The attorney explicitly told Regions that it would be difficult to rebut the voidability of the transfer, stating:

---

[8] *Id.* Heren_00304166 to Heren_0030499 (filed under seal pursuant to the *Amended Confidentiality Protective Order*, Doc. No. 282).
[9] *Id.*
[10] Adv. Pro. No. 8:15-ap-00117-CED Complaint, Doc. No. 1, p. 12.
[11] *Id.*, Ex. B.
[12] Doc. No. 335, Ex. C.

One critical component is whether Regions had "knowledge of the voidability of the transfer" at the time of the payoff. A transfer is voidable if (a) the transferor is insolvent at the time the transfer is made and (b) the transferor does not receive reasonably equivalent value for the transfer. ***Given our current circumstances, it may be difficult to argue that Regions didn't have knowledge of the voidability of the transfer because assuming the Transferors are insolvent it may be difficult to rebut that Regions didn't have any knowledge that these funds didn't come from the Transferors*** (which would be used by the chapter 7 trustee or chapter 11 debtor as evidence of the Transferors not receiving reasonably equivalent value).[13]

The attorney went on to suggest that Regions structure a proposed forbearance agreement with the obligors on the Regions Loans so as to strengthen Regions' defense to a potential avoidance action, stating:

However, the problem with this is the more specific we are with respect to the voidable transfer defenses in the document (e.g., requiring delivery of the intercompany notes as a CP), ***the easier it is for a bankruptcy trustee to show that we had knowledge of the voidable transfer.*** That is, by requiring delivery of the intercompany notes might simply draw more attention to the issue than necessary.

. . . .

1. A more subtle way of dealing with this issue might be to add a condition precedent to the Payoff Letter that Regions receive satisfactory evidence that the Borrower's funds have been used for the payoff. ***That way, we will preserve the argument that we didn't have knowledge of the voidability of the transfer without making the issue too obvious.***

. . . .

I think it's important to understand, however, that there is no way I can think of insulating Regions from this risk. ***Its knowledge of the borrowers, and the bank accounts make this a tough issue on the question of knowledge.***[14]

In that same July 12, 2010 email chain, another of Regions' outside attorneys suggested that for purposes of Regions' good-faith defense, it was better that Regions not "know too much:"

I do read 550(b)(1), as it might apply to a claim against the Bank on behalf of the hypothetical bankruptcy estate of any M-related deposit holder that hereafter files, ***as creating a safe harbor so long as we do not know too much. Of course the more we get into the situation and find out what they are doing, the more we may***

---

[13] *Id.* (emphasis supplied).
[14] *Id.* (emphasis supplied).

***develop knowledge that we don't now have.*** And if we engineer the other side of the deal by drafting or directing them to get notes then we end up in 510(c) territory for manipulating debt in order to pay of our own.[15]

The attorney then advised Regions:

And as covered earlier when we were discussing the matter, ***it is better to take the money and have a challenge than not get any of it.***[16]

On July 15, 2010, just three days after the exchange of the Emails, Regions entered into a forbearance agreement with the Mongelluzzis and some of the Mongelluzzi Entities (the "Forbearance Agreement).[17] Despite the fact that Debtors were neither parties nor signatories to the Forbearance Agreement,[18] and notwithstanding Regions' attorneys' advice that transfers from the Debtor Accounts could be voidable as fraudulent transfers, the Forbearance Agreement provided that funds in the Debtor Accounts would be applied to Regions' outstanding loans.[19] That very same day, Regions applied more than $7.4 million from the Debtor Accounts[20] to the Regions Loans (the "Subject Transfers"). As agreed upon in the Forbearance Agreement, Regions then released its liens on assets of the Mongelluzzi Entities, including those of one of the Able Body Entities, PreferAble People, LLC.

In September 2010, relevant to Regions' affirmative defenses described below, the Able Body Entities, including Debtors, sold their assets to a third party, MTD Personnel, LLC ("MTD"), for approximately $42 million.[21] The transaction was structured with the Able Body Entities' existing loans from Synovus Bank being paid off with a "new" loan from Synovus to MDT – essentially

---

[15] Doc. No. 335, Ex. D. (emphasis supplied).
[16] *Id.* (emphasis supplied).
[17] Doc. No. 398, Ex. 1.
[18] The Forbearance Agreement, dated July 15, 2010, was between Able Body Temporary Services, Inc., PreferAble People, LLC, Professional Staffing – A.B.T.S., Inc., YJNK II, Inc., Cecil B. DeBoone, LLC, Frank Mongelluzzi, Anne Mongelluzzi, Organized Confusion, LLP, and Regions Bank.
[19] Doc. No. 398, Ex. 1.
[20] Rotrpick, $2,074,765.90; YJNK VIII, $2,247,603.01; Training U, $1,772,195.96; and YJNK XI CA, $1,325,010.13. See Complaint (Adv. Pro. No. 8:15-ap-00117-CED Complaint, Doc. No. 1, Ex. B).
[21] Adv. Pro. 14-ap-00645-CED, Doc. No. 158, ¶ 62.

exchanging the original borrowers, the Able Body Entities, for a new one, MDT.[22] Later, MDT sold the Able Body Assets to another party, TrueBlue, Inc., for over $48 million.[23]

### B.    The Bankruptcy Filings and the Fraudulent Transfer Litigation

In 2011, Frank Mongelluzzi filed a voluntary Chapter 11 case and shortly thereafter converted the case to a Chapter 7. In May 2013, the trustee in Mr. Mongelluzzi's individual case, Angela Welch, filed Chapter 7 cases for sixteen of the Mongelluzzi Entities. These cases are frequently referred to as the "Corporate Cases." Plaintiff was appointed as the Chapter 7 Trustee in the Corporate Cases.

In fourteen of the Corporate Cases, Plaintiff filed complaints against Regions seeking to avoid fraudulent transfers under the Florida Uniform Fraudulent Transfer Act, Chapter 726, Florida Statutes, and 11 U.S.C. §§ 544 and 550.

The complaints in the Debtors' cases (the "Complaints") allege two types of transfers from the Debtor Accounts to Regions. The first type of transfers, defined in the Complaints as the "Other Loan Repayment Transfers," is referred to by the Court in this opinion as the "Subject Transfers." The Complaints define the second type of transfer as the "Overdraft Loan Repayments." In the Complaints, Plaintiff seeks to avoid and recover both the Subject Transfers and the Overdraft Loan Repayments as fraudulent transfers. The Summary Judgment Motions relate to Counts IV and VII of the Complaints, which seek to recover the Subject Transfers only, and to Regions' Ninth and Twelfth Affirmative Defenses.

In Count IV of the Complaints, Plaintiff seeks to avoid the Subject Transfers as constructively fraudulent transfers under Sections 726.106(1) and 726.108, Florida Statutes,[24] by operation of 11

---

[22] The MDT and Synovus Bank transactions have themselves been the subject of fraudulent transfer litigation, settled by the parties after notice to creditors and approval by this Court. (Adv. Pro. Nos. 8:13-ap-01041-CED and 8:14-ap-00645-CED).

[23] Adv. Pro. No. 8:14-ap-00645-CED, Doc. No. 158, ¶ 70.

[24] Unless otherwise stated, statutory references are to the Florida Statutes.

U.S.C. § 544(b). In Count VII, Plaintiff seeks to recover the avoided Subject Transfers under 11 U.S.C. § 550.[25]

In its Ninth Affirmative Defense, Regions alleges that Plaintiff fails to state a claim upon which relief can be granted for constructive fraud because Regions took the Subject Transfers in good faith and for reasonably equivalent value. Regions' Twelfth Affirmative Defense alleges, *inter alia*, that the Subject Transfers were not transfers of Debtors' assets as they provided a direct and indirect benefit to Debtors, who, Regions alleges, operated as part of a "common enterprise/single economic unit" with the Mongelluzzi Entities.

To support the Summary Judgment Motions, Plaintiff offers the Emails, Regions' internal monitoring reports, Debtors' bank statements, proofs of claim filed by various creditors, and the declarations of Anne Mongelluzzi.[26]

In Mrs. Mongelluzzi's declarations, she declares that, as to each Debtor, she was Debtors' sole manager; that Debtors had other outstanding obligations at the time the Subject Transfers were made; that after the date of the Subject Transfers, Debtors did not have sufficient cash to pay their liabilities as they became due; and that, aside from cash and accounts receivable, Debtors had no other tangible assets. Mrs. Mongelluzzi's declarations are not supported by Debtors' financial statements or other records.

Regions moved to strike Mrs. Mongelluzzi's declarations on the grounds that they are conclusory and not made with personal knowledge.[27] The Court denied the motions to strike, finding that Mrs. Mongelluzzi, as Debtors' manager, had sufficient personal knowledge of their financial

---

[25] The recovery count in the YJNK VIII adversary is Count VIII, rather than Count VII. (Adv. Pro. 8-15-ap-00122-CED, Doc. No. 1, p. 25.)

[26] Doc. Nos. 335, 336, 337, and 360, pp. 14-47; Heren_00304166 to Heren_0030499 (filed under seal pursuant to the *Amended Confidentiality Protective Order*, Doc. No. 282).

[27] Doc. Nos. 394, 395, 396, and 397.

condition.[28] However, in its oral ruling, the Court noted that the weight of the declarations might not be sufficient to enable Plaintiff to obtain summary judgment.[29]

At her deposition, Mrs. Mongelluzzi testified that all of the Mongelluzzi Entities were run by her and Mr. Mongelluzzi, with no other directors or officers.[30] She testified that all of the Able Body Entities and some of the other Mongelluzzi Entities utilized the same employees for billing, invoicing, banking, and payroll.[31] She also testified that the Mongelluzzi Entities routinely financed each other and shared common offices and employees.[32]

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, incorporated by Federal Rule of Bankruptcy Procedure 7056, a moving party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33] A factual issue is genuine if the evidence is such that the fact finder could return a verdict for the nonmovant. Facts are material if, under applicable law, they would affect the outcome of the suit.[34]

The moving party bears the initial burden of showing the absence of a genuine issue of material fact by identifying portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits that support the motion.[35] In deciding whether the movant has met this burden, the court must view all record evidence and draw all reasonable inferences in favor of the nonmoving party.[36]

---

[28] Doc. No. 439.
[29] Doc. No. 440, p. 19.
[30] Doc. No. 398, Ex. 4, p. 115.
[31] Doc. No. 398, Ex. 4, pp. 115-16.
[32] Doc. No. 398, Ex. 4, pp. 117-18.
[33] Fed. R. Civ. P. 56(a).
[34] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[35] *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).
[36] *In re Harwell*, 628 F.3d 1312, 1316 (11th Cir. 2010) (citing *Loren v. Sasser*, 309 F.3d 1296, 1301-02 (11th Cir. 2002).

If the movant makes such an affirmative showing, the burden then shifts to the nonmoving party to go beyond the pleadings and to designate specific facts showing there is a genuine issue of material fact.[37]

The Eleventh Circuit Court of Appeals in *Fitzpatrick v. City of Atlanta*,[38] discussed the burdens of the moving and nonmoving parties on summary judgment. The bankruptcy court in *In re Fields*[39] succinctly summarized the Eleventh Circuit's ruling, stating that for issues on which the movant bears the burden of proof, the movant must come forward with credible evidence that would entitle the movant to a directed verdict, if not controverted at trial.

But for issues on which the nonmovant bears the burden at trial, the moving party may either show that there is an absence of evidence to support the nonmoving party's case or may come forward with affirmative evidence showing that the nonmoving party will be unable to prove the affirmative defense at trial. If the moving party carries its initial burden, the responsibility moves to the nonmoving party to show the existence of a genuine issue of material fact.[40]

The *Fields* court explained that the nonmovant's burden on the issues on which it has the burden of proof varies depending on the kind of evidence put forth by the movant. If the movant put forth affirmative evidence, the nonmovant must come forward with sufficient evidence to withstand a motion for directed verdict. If the movant pointed to the absence of evidence, then the nonmovant can satisfy its burden by either showing that the moving party overlooked or ignored evidence in the record to withstand a motion for directed verdict or by coming forward with sufficient evidence to withstand a motion for directed verdict.[41]

---

[37] *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555 (11th Cir. 1990); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993).
[38] 2 F.3d 1112, 1116 (11th Cir. 1993) (citing *Anderson*, 447 U.S. at 249-50).
[39] 2018 WL 1616840, at *2 (Bankr. M.D. Fla. Mar. 30, 2018).
[40] *Fitzpatrick v. City of Atlanta*, 2 F.3d at 1115-1116.
[41] *In re Fields,* 2018 WL 1616840, at *3.

### III.    PLAINTIFF'S MOTION AS TO COUNT IV – CONSTRUCTIVELY FRAUDULENT TRANSFERS UNDER § 726.106(1)

Under § 726.106(1), a transfer is fraudulent (1) as to a creditor whose claim arose before the transfer was made, (2) if the debtor made the transfer without receiving a reasonably equivalent value in exchange, and (3) if the debtor was insolvent or became insolvent as a result of the transfer.

The Court will address each of the elements of § 726.106(1) in turn.

#### A.    Existence of a Creditor Whose Claim Arose Before the Transfer

To establish the existence of a creditor whose claim arose before the date of the Subject Transfers, Plaintiff relies upon the proofs of claim filed by the Internal Revenue Service ("IRS") in the Rotrpick, YJNK XI, and YJNK VIII cases.[42] For Training U, Plaintiff relies upon the proofs of claim filed by Anne Mongelluzzi as trustee of the Safe Harbor Employer Services Retirement Plan ("Safe Harbor") and Choice Plus HRA & Buy Up Medical Plans ("Choice Plus").[43] Regions does not contest that Safe Harbor and Choice Plus held claims against Training U before the date of the Subject Transfers.

The Court has reviewed the IRS's proofs of claim. They reflect the Debtors' separate tax liabilities in amounts ranging from $25,000.00 to $38,000.00 for the quarter ending June 30, 2010, a date that is before the July 15, 2010 date of the Subject Transfers. Regions argues that the Court should not consider the IRS's claims because Debtors' bankruptcy schedules listed the IRS's claim as disputed. The Court notes that Debtors' bankruptcy schedules were prepared and signed by Angela Welch, the trustee in Mr. Mongelluzzi's individual Chapter 7 case, and that it was she who listed the

---

[42] Case No. 8:13-bk-06894-CED, Claim No. 1-1; Case No. 8:13-bk-06875-CED, Claim No. 1-1; Case No. 8:13-bk-06902-CED, Claim No. 1-1.
[43] Case No. 8:13-bk-06896-CED, Claim No. 6-1 of Safe Harbor Employer Services Retirement Plan and Claim Nos. 7-1 and 8-1 of Choice Plus HRA & Buy Up Medical Plans.

IRS's claims as disputed.[44] In any event, § 726.102(4) specifically defines "claim" as including disputed claims. Accordingly, the Court finds that the IRS was a creditor of Rotrpick, YJNK XI, and YJNK VIII prior to July 15, 2010.

Therefore, the Court finds that there is no disputed issue of material fact that each Debtor had at least one creditor whose claim arose before the July 15, 2010 date of the Subject Transfers.

### B.      *Reasonably Equivalent Value*

A debtor receives "value" when in exchange for a transfer, property is transferred or an antecedent debt is secured or satisfied.[45] To determine whether a debtor received reasonably equivalent value in exchange for a transfer, the Court must determine the value of what was transferred and compare it to what was received.[46] Whether fair value was given for a particular transfer is often a question of fact.[47] "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange."[48]

Courts consider two types of benefits when analyzing reasonably equivalent value: direct benefits (benefits that the debtor receives directly) and indirect benefits (benefits that the debtor receives indirectly).[49] If a plaintiff proves that the debtor did not receive direct benefits reasonably equivalent to the value it gave up, the burden is on the defendant to produce evidence that the debtor indirectly received sufficient, concrete value.[50]

---

[44] The lists of unsecured creditors prepared and filed by Ms. Welch in each of the Corporate Debtors' cases, consisting of over 300 creditors, are virtually identical.

[45] Fla. Stat. § 726.104(1).

[46] *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 254 (Bankr. M.D. Fla. 2003).

[47] *In re TOUSA, Inc.*, 680 F.3d 1298, 1311 (11th Cir. 2012).

[48] *In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325, 1336 (11th Cir. 2007).

[49] *See In re Pembroke Dev. Corp.*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991).

[50] *In re TOUSA, Inc.*, 422 B.R. 783, 866 (Bankr. S.D. Fla. 2009), *quashed in part*, 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part*, *rev'd in part*, 680 F.3d 1298 (11th Cir. 2012).

Here, Plaintiff provided evidence that the Subject Transfers were applied to the Regions Loans, to which Debtors were neither obligors nor guarantors. The Court finds that Plaintiff met her burden to establish that Debtors did not receive a direct benefit from the Subject Transfers. The burden then shifts to Regions to show that Debtors received an indirect benefit.

Regions contends that Debtors received reasonably equivalent value for the Subject Transfers for three reasons:  (1) because Debtors received indirect benefits from the Subject Transfers, (2) because of the identity of interests shared between Debtors and the Mongelluzzi Entities, and (3) as also stated in Regions' Twelfth Affirmative Defense, because Debtors were engaged in a common enterprise with the Mongelluzzi Entities. The Court will discuss each of these contentions in turn.

*(1)    Indirect Benefit*

Regions contends that Debtors received an indirect benefit from the Subject Transfers because, in exchange, Regions agreed to forbear from exercising it rights against the Mongelluzzis and other Mongelluzzi Entities. Regions argues that this forbearance gave the Able Body Entities – including Debtors – more time to effectuate the sale of their assets to MDT.[51]

While the general rule is that the payment or assumption of a third party's debt by an insolvent is a fraudulent transfer,[52] the Eleventh Circuit Court of Appeals in *In re Rodriguez*[53] recognized that an indirect benefit may constitute reasonably equivalent value if an economic benefit was conferred upon the debtor. The Eleventh Circuit reasoned that "[t]he purpose of voiding transfers unsupported by 'reasonably equivalent value' is to protect creditors against the depletion of a bankrupt's estate."

---

[51] Doc. No. 398, pp. 12-16.
[52] *In re PSN USA, Inc.*, 615 F. App'x 925, 928 (11th Cir. 2015) (quoting *In re Evans Potato Co. Inc.*, 44 B.R. 191, 193 (Bankr. S.D. Ohio 1984)).
[53] 895 F.2d 725, 727 (11th Cir. 1990).

This purpose would not be served if the debtor received an economic benefit as "the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer."[54]

In *Rodriguez,* the debtor's subsidiary owned a jet airplane that was collateral for a loan to the subsidiary. The debtor was not liable on the loan. When the debtor filed bankruptcy, the liquidating trust created by its confirmed Chapter 11 plan sought to avoid payments made by the debtor to the lender. The lender argued that the debtor received an indirect benefit by virtue of the reduction of the loan and the usage of the airplane.

The court recognized that a party may receive an indirect benefit if it shared in the reduction of indebtedness or had the usage of the airplane.[55] But the court found that the debtor did not receive an indirect benefit for two reasons:  first, the debtor was not liable on the loan; and second, because the debtor was a passive holding company, it could not have made use of the airplane. The court also found that there was no basis for piercing the corporate veil between the debtor and the subsidiary.

The facts in another Eleventh Circuit case, *In re PSN USA, Inc.,*[56] were very different. There, despite the fact that the debtor was not obligated under its parent company's contract with a third party for satellite services, the debtor received the satellite services that were necessary for the debtor's operation of its cable television channel. The Eleventh Circuit found that the debtor had received reasonably equivalent value for its payments to the third party.

Here, the Court finds there are material issues of fact as to whether Debtors received an economic benefit from the sale of the Able Body Entities' assets to MDT and whether Regions' forbearance and release of its liens enabled that sale. These issues of fact preclude the entry of summary judgment on the issue of reasonably equivalent value.

---

[54] *In re Northlake Foods, Inc.*, 715 F.3d 1251, 1256 (11th Cir. 2013) (citing *Rodriguez,* 895 F.2d at 727).
[55] *Rodriguez*, 895 F.2d at 727.
[56] 615 F. App'x 925 (11th Cir. 2015).

*(2)    Identity of Interests*

Regions contends there are material issues of fact as to whether Debtors received reasonably equivalent value because of their alleged identity of interests with the other Able Body Entities, who directly benefitted from the transfers. Generally, the identity of interests doctrine recognizes that if two parties are so related that they share an identity of interests "what benefits one will, in such case, benefit the other to some degree."[57]

The bankruptcy court in *In re PSN USA, Inc.*,[58] considered the identity of interests rule, relying on the since-reversed district court's ruling in *In re TOUSA*[59] and other cases from the Southern District of Florida.[60] The bankruptcy court analyzed the facts presented, including that the debtor's management looked at the debtor and its parent as one company, the debtor and the parent performed supplementary services, the debtor's chief financial officer testified that the debtor and its parent could not do business without the other, the debtor and the parent did business under the same name, and the debtor and its parent shared the same officer and utilized the same cash management system. The bankruptcy court concluded that the debtor and its parent did share an identity of interest.

Here, Mrs. Mongelluzzi testified at her deposition that the Mongelluzzi Entities' had common management, shared employees and office space, and intermingled finances. The Court finds that these facts demonstrate the existence of genuine issues of material fact that preclude this Court from finding, as a matter of law, that an identity of interests among Debtors, the Mongelluzzi Entities, and the Able Body Entities did not exist.

---

[57] *In re Royal Crown Bottlers of N. Ala., Inc.*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982).

[58] The Court notes that the Eleventh Circuit's opinion does not address the identity of interests rule.

[59] *In re TOUSA, Inc.*, 422 B.R. 783, 861 (Bankr. S.D. Fla. 2009), *quashed in part*, 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012).

[60] *See In re Miami Gen. Hosp., Inc.*, 124 B.R. 383, 393-95 (Bankr. S.D. Fla. 1991); *In re Pembroke Dev. Corp.*, 124 B.R. 398, 399-401 (Bankr. S.D. Fla. 1991); *see also Armstrong v. Collins*, 2010 WL 1141158, at 28 (S.D.N.Y. Mar. 24, 2010); *Telefast, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1378 (D.N.J. 1984); *In re Royal Crown Bottlers of N. Ala., Inc.*, 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982).

(3)     *Common Enterprise Doctrine*

Regions raises the common enterprise doctrine in its opposition to summary judgment both on Count IV and its Twelfth Affirmative Defense. Regions argues that Debtors received a direct and indirect benefit from the Subject Transfers because Debtors "operated as part of a common enterprise/single economic unit with the other [Mongelluzzi Entities]."[61] Plaintiff responds that no court in the Eleventh Circuit has recognized the common enterprise doctrine as a defense to a fraudulent transfer action.

The common enterprise or single business enterprise doctrines provide that "the legal fiction of a distinct corporate entity may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation."[62] Although recognized in other jurisdictions,[63] the common enterprise doctrine has not been recognized by the Eleventh Circuit Court of Appeals. And Regions has not cited to an opinion of any court within this jurisdiction that has recognized the application of the common enterprise doctrine as a defense to fraudulent transfer claims.

To the contrary, the bankruptcy court in *In re TOUSA, Inc.*,[64] expressly rejected the application of the common enterprise doctrine as a defense to a fraudulent transfer claim. There, the unsecured creditors' committee filed a fraudulent transfer action to avoid a security interest in the debtors' assets. The security interest had been given as collateral for a $500 million loan to the debtors' parent company in order to finance a joint venture. The debtors were not parties to the joint venture and had

---

[61] Case No. 8:15-ap-00117-CED, Doc. No. 33-1, p. 15.

[62] *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257 (La. Ct. App. 1991), *writ denied*, 580 So. 2d 668 (La. 1991).

[63] *See, e.g.*, *In re GGW Brands, LLC*, 504 B.R. 577, 621 (Bankr. C.D. Cal. 2013); *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257 (La. Ct. App. 1991), *writ denied*, 580 So. 2d 668 (La. 1991); *Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.*, 159 Cal. Rptr. 3d 469, 480 (Cal. Ct. App. 2013); *Attorney General v. M.C.K. Inc.*, 736 N.E.2d 373, 381-82 (Mass. 2000).

[64] 422 B.R. 783 (Bankr. S.D. Fla. 2009), *quashed in part,* 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part,* 680 F.3d 1298 (11th Cir. 2012).

not guaranteed the loan. In defense, the lenders argued that the court should view the debtors and their parent company as a single common enterprise.

The *TOUSA* bankruptcy court found that the common enterprise doctrine finding that it lacks any roots in statutory law, stating:

> [t]wo legal doctrines sometimes permit a court to treat otherwise distinct and independent entities as a single, consolidated debtor: the equitable doctrine of substantive consolidation and the "alter ego" doctrine (sometimes referred to as "veil piercing").[65]

The bankruptcy court held that the lenders' argument that the debtors and their parent company should be treated collectively as a common enterprise was tantamount to applying the "doctrines of substantive consolidation and veil piercing in substance even though the recognized prerequisites for invoking those doctrines are not present . . . ."[66]

This Court agrees with the *TOUSA* analysis. By raising the common enterprise doctrine, Regions invokes the equitable doctrines of substantive consolidation and alter ego.

(a)    *Substantive Consolidation*

The Eleventh Circuit Court of Appeals has held that "[a] proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit."[67]

As the Eleventh Circuit then explained, "substantial identity" relates to whether creditors have not relied solely upon the credit of one of the entities involved:

---

[65] *Id.* at 861.

[66] *Id.*

[67] *Eastgroup Props. v. Southern Motel Ass'n, Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991).

> When this showing [of "substantial identity" and that consolidation is necessary] is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation.[68]

After considering this analysis – that "substantial identity" relates to whether creditors have or have or have not relied solely upon the credit of one of the entities involved – the Court concludes that "substantial identity" is a wholly different concept from "identity of interests."

Although the Court found Mrs. Mongelluzzi's deposition testimony regarding the common management, sharing of employees and office space, and intermingled finances of the Mongelluzzi Entities to be sufficient to create issues of fact on the "identity of interests" issue, standing alone, it does not create an issue of fact on "substantial identity." In any event, Regions has failed to demonstrate that some harm will be avoided or benefit achieved if Debtors were to be substantively consolidated with the other Mongelluzzi Entities or Able Body Entities.

The Court finds that Plaintiff has met her burden to show that substantive consolidation does not apply, and Regions has offered no evidence to support a finding of substantive consolidation. Finally, the Court notes that Regions has not moved this Court for substantive consolidation of Debtors' cases with those of other Mongelluzzi Entities,[69] depriving other creditors with proper notice and the opportunity to be heard in these cases.

*(b)    Alter Ego*

With regard to the alter ego theory of disregarding corporate separateness, otherwise referred to as veil-piercing, "courts are reluctant to pierce the corporate veil and will do so only in exceptional

---

[68] *Id.* at 249. (citations omitted).

[69] In the early stages of Mr. Mongelluzzi's individual Chapter 7 case, Trustee Welch commenced an adversary proceeding seeking to substantively consolidate his case with most, if not all of the entities owned by him (Adv. Pro. No. 8:11-ap-00463-CED). The adversary proceeding was voluntarily dismissed. Regions has disclaimed any request for substantive consolidation. (Doc. No. 398, p. 17.)

cases where there has been extreme abuse of the corporate form."[70] Under Florida law, in order to pierce the corporate veil between a corporation and its shareholder, the court must find by a preponderance of the evidence that:

(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's existence, was in fact nonexistent and the shareholders were in fact alter egos of the corporation;
(2) the corporate form must have been used fraudulently or for an improper purpose; and
(3) the fraudulent or improper use of the corporate form caused injury to the claimant.[71]

Regions has not submitted any evidence to demonstrate that Debtors' separate corporate existence was non-existent, that Debtors were formed for improper purpose, or that Debtors fraudulently or improperly used the corporate form. Regions also presented no evidence on whether Debtors followed corporate formalities. Even if Debtors did not follow corporate formalities, this alone is not enough to pierce the corporate veil.[72]

The Court finds that Regions has failed to meet its burden of proof to show that the alter ego theory applies.

(4)     *Summary of the Ruling on Reasonably Equivalent Valu*e

To summarize, the Court finds there are genuine issues of material fact on the issue of whether Debtors received indirect benefits from the Subject Transfers and whether there is an identity of interests between Debtors and other Mongelluzzi Entities and Able Body Entities such that Debtors received an economic benefit from the Subject Transfers. These factual issues preclude the Court's granting summary judgment as to Count IV.

---

[70] *Gov. of Aruba v. Sanchez*, 216 F. Supp. 2d 1320, 1362 (S.D. Fla. 2002).
[71] *In re Xenerga, Inc.*, 449 B.R. 594, 598 (Bankr. M.D. Fla. 2011) (citing *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998).
[72] *John Daly Enterprises, LLC v. Hippo Golf Co., Inc.*, 646 F. Supp. 2d 1347, 1353 (S.D. Fla. 2009) ("Under Florida law, mere failure to observe corporate formalities alone is not enough.") (quoting *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 469 (Bankr. M.D. Fla.1994)).

However, the Court concludes, as a matter of law, that because Regions has not met its burden of proof on the theories of either substantive consolidation or alter ego, Regions is unable to assert the common enterprise defense to oppose entry of judgment on Count IV or as an affirmative defense.

**C.    Insolvency**

Under § 726.103(2), a debtor is presumed to be insolvent when it is not paying its debts as they become due.[73] If the presumption does not arise, under § 726.103(1) a debtor is insolvent when the sum of its debts is greater than its assets at fair valuation."[74]

*(1)    Plaintiff has not established the presumption of insolvency.*

To establish the presumption of insolvency under § 726.103(2), Plaintiff offers the IRS claims in the Rotrpick, YNJK VIII, and YNJK XI cases and the Safe Harbor and Choice Plus claims in the Training U case.[75] In her reply brief, Plaintiff also points to the proofs of claim filed in each of Debtors' cases by CNA Insurance Company in the amount of $2,797,508.00.[76]

The Court finds that the IRS claims are insufficient to establish that Debtors were not paying their debts as they became due.

With respect to the CNA claims, the Court notes that they rose from a settlement agreement between CNA and some of the Mongelluzzi Entities – but not with Debtors. The only apparent connection between CNA and Debtors is that the signatories to the settlement agreement assigned as collateral for payments due under the settlement agreement any amounts and rights that the signatories and their affiliated entities held in two premium fund accounts under policies issued by another insurance company. Even if CNA's claim is valid as to Debtors, the failure to pay the debt owed to a

---

[73] Fla. Stat 726.103(2).
[74] Fla. Stat. 726.103(1).
[75] Doc. No. 409, p. 3.
[76] Doc. No. 409, p. 3; Case No. 8:13-06894-CED, Claim No. 9-1; Case No. 8:13-bk-06875-CED, Claim No. 7-1; Case No. 8:13-bk-06902-CED, Claim No. 10-1; and Case No. 8:13-bk-06896-CED, Claim No. 5-1.

single creditor is insufficient, for summary judgment purposes, for the insolvency presumption to apply.[77]

Finally, the Court finds that Mrs. Mongelluzzi's statements in her declaration that Debtors were not paying their debts as they became due are conclusory and not supported by Debtors' books and records. Mrs. Mongelluzzi's deposition testimony reflects that she did not have a recollection of Debtors' financial condition.[78]

Accordingly, the Court finds that Plaintiff has not established that Debtors were unable to pay their debts as they became due.

(2)      *Plaintiff has not established balance sheet insolvency.*

Under § 726.103(1), referred to as the "balance sheet test," the Court may determine that a debtor is insolvent if the value of its liabilities exceed the value of its assets.[79] To establish insolvency under the balance sheet test, Plaintiff relies heavily on Mrs. Mongelluzzi's declaration,[80] particularly her statements that "[a]side from its cash and accounts receivable, [Debtor] had no other tangible assets" and "[o]nce its accounts at Regions were closed, it lost access to nearly all of its cash."[81]

Again, Plaintiff has not provided the Court with Debtors' financial statements or evidence of Debtors' accounts receivable that are necessary for this Court to determine insolvency under the "balance sheet test." Instead, Plaintiff relies on bank statements of the Debtor Accounts dated between July and September 2010 to establish Debtors' insolvency. While the bank statements reflect the balances in the Debtor Accounts as of their dates, standing alone they do not evidence that Debtors' total liabilities exceeded its assets.

---

[77] *See Balsamo v. Gruppo Ceramiche Ricchetti, S.P.A.*, 862 So. 2d 812, 814 (Fla. 4th DCA 2003).
[78] Doc. No. 447.
[79] *United States v. Major*, 551 B.R. 531, 541 (M.D. Fla. 2016).
[80] Doc. Nos. 335, 336, 337, and 360, Ex. A.
[81] *Id.* (citing A. Mongelluzzi Declaration ¶ 7).

And, notably, Mrs. Mongelluzzi's declaration refers only to "tangible" assets and does not mention intangible assets such as tradenames, customer relationships, etc. Given TrueBlue, Inc.'s willingness to pay over $48 million for the assets of the Able Body Entities—including Debtors' assets—there is a genuine issue of fact as to whether Debtors were insolvent on the date of the Subject Transfers or were rendered insolvent as of the date of the Subject Transfers.

Plaintiff acknowledges that she can rely on Debtors' claims registers and Debtors' bankruptcy schedules[82] to establish Debtors' insolvency only as of the Petition Date, rather than as of the date of the Subject Transfers.[83] Plaintiff argues that this Court could apply the "retrojection theory" of insolvency because of Regions' extensive delays in producing its records in discovery.[84] Regions responds that the retrojection theory is only available where the debtor's financial condition is unascertainable as of the relevant date.

The Court will not consider the retrojection theory of insolvency at this time for two reasons: first, because it was raised for the first time in Plaintiff's reply briefs in support of the Summary Judgment Motions,[85] and second, because there has been no showing that Debtors' financial condition as of the date of the Subject Transfers is unascertainable. And while the Court notes that Regions' responses to discovery requests have been far less than timely or complete, Plaintiff has not demonstrated that it lacks access to Debtors' books and records.

---

[82] As noted above, Debtors' bankruptcy schedules were prepared and filed by Angela Welch, the Chapter 7 Trustee in Mr. Mongelluzzi's individual case.

[83] Doc. Nos. 409, 410, 411, and 412.

[84] Under the retrojection theory a debtor may be shown to be insolvent at a date later than the date of the questioned transfer, if it is shown that the debtor's financial condition did not change during the interim period. *In re Toy King Distributors, Inc.*, 256 B.R. 1, 99 (Bankr. M.D. Fla. 2000); *see also In re Prime Realty, Inc.*, 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007).

[85] Doc. Nos. 409, 410, 411, and 412.

### IV.    PLAINTIFF'S MOTION AS TO COUNT VII – RECOVERY OF AVOIDED TRANSFERS

Section 550(a) of the Bankruptcy Code permits a trustee to recover transfers that have been avoided. Because the Court has found that genuine issues of material fact preclude avoidance of the Subject Transfers as sought in Count IV, there is nothing for Plaintiff to recover on Count VII at this time.[86]

### V.    PLAINTIFF'S MOTION AS TO REGIONS' NINTH AFFIRMATIVE DEFENSE – GOOD FAITH

In its Ninth Affirmative Defense, Regions contends that even if the Court finds the Subject Transfers to be constructively fraudulent under § 726.109(1), they are not subject to avoidance because Regions took them for value and in good faith. Section 726.109(1) specifically applies to fraudulent transfers voidable under § 726.105(1)(a), which are transfers made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor;" § 726.109(1) is not relevant to constructively fraudulent transfers.

Bankruptcy Code § 550 also provides for a good-faith defense. Under § 550(b)(1), the trustee may not recover against a transferee that "takes for value, . . . in good faith, and without knowledge of the voidability of the transfer avoided."

To the extent Regions seeks to assert the good-faith defense to Plaintiff's avoidance claims for actual fraud under § 726.109(1) (Counts I and III of the Complaints) and to Plaintiff's claim for recovery under 11 U.S.C. § 550(b)(1) (Count VII), the Court will analyze the good-faith defense.

To prevail on its good-faith defense, Regions bears the burden of proving by a preponderance of the evidence that it received the loan repayments in good faith.[87] A party can rebut the good-faith

---

[86] *See In re Sawran*, 359 B.R. 348, 352 (Bankr. S.D. Fla. 2007) (recognizing that avoidance of a transfer is necessary to recover from a transferee).

[87] *In re Pearlman*, 440 B.R. 900, 906 (Bankr. M.D. Fla. 2010).

defense by showing that the recipient of the transfer had knowledge of the debtor's financial condition or fraudulent purpose.[88] Although good faith is not defined in the Bankruptcy Code, courts apply an objective standard to determine if a transferee has acted in good faith.[89]

In analyzing the issue of good faith, a court must consider whether the transferee had actual knowledge of the debtor's fraudulent purpose in making the transfers or had knowledge of facts or circumstances that would have induced an ordinarily prudent person to make inquiry and if the inquiry, if made with reasonable diligence, would have led to the discovery of the debtor's fraudulent purpose.[90]

"Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement.'"[91] A transferee cannot meet its burden of a diligent inquiry by intentionally remaining willfully ignorant of facts that would cause it to be on notice.[92] The willful blindness inquiry focuses on whether an individual took deliberate action to avoid learning of a fact after there was a high probability that the fact was true.[93] A transferee may not put on "blinders" prior to entering into transactions with the debtor where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency.[94]

---

[88] *In re World Vision Ent., Inc.*, 275 B.R. 641 (Bankr. M.D. Fla. 2002).

[89] *In re Berkman*, 517 B.R. 288, 303 (Bankr. M.D. Fla. 2014).

[90] *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1319 (M.D. Fla. 2009); *In re Pearlman*, 440 B.R. 900, 906 (Bankr. M.D. Fla. 2010); *In re Berkman*, 517 B.R. 288, 303 (Bankr. M.D. Fla. 2014).

[91] *In re Kudzu Marine, Inc.*, 569 B.R. 192, 209 (Bankr. S.D. Ala. 2017) (quoting *In re Int'l Mgmt. Assocs., LLC*, 2016 WL 552491 (Bankr. N.D. Ga. Feb. 10, 2016).

[92] *In re World Vision Ent., Inc.*, 275 B.R. at 659 (citing *In re Cannon*, 230 B.R. 546, 592 (Bankr. W.D. Tenn. 1999), *rev'd on other grounds*, 277 F.3d 838 (6th Cir. 2002)); *see also In re Evergreen Sec., Ltd.*, 319 B.R. 245, 254 (Bankr. M.D. Fla. 2003); *In re Kudzu Marine, Inc.*, 569 B.R. 192, 210 (Bankr. S.D. Ala. 2017); *In re Model Imperial, Inc.*, 250 B.R. 776 (Bankr. S.D. Fla. 2000).

[93] *See Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 563 B.R. 737, 749 (Bankr. S.D.N.Y. 2017).

[94] *In re Evergreen Sec., Ltd.*, 319 B.R. at 254; *In re Kudzu Marine, Inc.*, 569 B.R. at 210.

For example, in *In re World Vision*, the trustee filed a fraudulent transfer action against the recipients of brokers' fees paid in connection with the debtor's Ponzi scheme. In analyzing the defendants' good-faith defense, the court applied an objective test. The court looked to whether (1) the circumstances would place a reasonable person on inquiry notice of debtor's fraudulent purpose; and (2) if a diligent inquiry would have discovered the fraudulent purpose. The court found that the defendants could not claim the good-faith defense because they were on notice of the debtor's fraudulent Ponzi scheme and had failed to conduct a reasonable investigation. The court found that defendants' due diligence was lacking because "[t]hey just did not want to ask too many questions because they did not want to know too much."[95]

Courts are frequently asked to infer a defendant's lack of good faith from a timeline of objective events. But here, no inference is necessary; the Court has Regions' own email communications with its outside attorneys to evidence exactly what Regions knew and exactly what Regions did not want to know.[96]

Regions knew of the check-kiting scheme as of June 28, 2010, and was on inquiry notice of Debtors' possible insolvency;[97] Regions knew that Debtors were not its borrowers; Regions knew that if Debtors ended up in bankruptcy, the Subject Transfers could be a fraudulent transfer; Regions knew that its knowledge of the possible avoidance of the Subject Transfers was critical to its defense of an avoidance action; Regions knew that its attorneys recommended structuring the Forbearance Agreement so as to preserve its good-faith defense; Regions knew it was better off "as long as we do not know too much" and that "the more we get into the situation, the more we may develop knowledge

---

[95] *In re World Vision Ent., Inc.*, 275 B.R. at 660.
[96] Doc. No. 335, Ex. C and D.
[97] Heren_00304166 to Heren_0030499 (filed under seal pursuant to the *Amended Confidentiality Protective Order*, Doc. No. 282).

that we don't now have;" and finally, Regions knew that "it is better to take the money and have a challenge than not get any of it."[98]

Based upon this overwhelming and incontrovertible evidence, the Court concludes that Regions knew exactly what it was doing when it took the Subject Transfers. Regions deliberately chose not to inquire regarding Debtors' possible insolvency and Regions knew of the possible avoidance of the Subject Transfers. Just like the defendants in *World Vision*, Regions "just did not want to ask too many questions because they did not want to know too much."

Parties who rely on the good-faith defense bear the burden of proving their own good faith.[99] The Court finds that Plaintiff has supported her motion for summary judgment on Regions' Ninth Affirmative Defense with affirmative evidence showing that Regions will be unable to prove its good faith at trial. The burden then shifts to Regions to show the existence of a genuine issue of material fact. The Court finds that Regions has failed to provide evidence sufficient to withstand summary judgment on this issue.

Therefore, the Court will grant the Summary Judgment Motions with respect to Regions' assertion of good faith in its Ninth Affirmative Defense as it relates to the Subject Transfers.

## VI. PLAINTIFF'S MOTION AS TO REGIONS' TWELFTH AFFIRMATIVE DEFENSE – COMMON ENTERPRISE DOCTRINE

Regions' Twelfth Affirmative Defense recites a number of defenses:  the common enterprise doctrine; that the transfers to "Regions were not 'transfers' of any assets of [these] Debtor[s];" and that the Subject Transfers "were made in good faith without any intent to hinder, delay, or defraud

---

[98] Doc. No. 335, Ex. D.
[99] *See In re M & L Business Machine Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996); *In re National Liquidators*, 232 B.R. 99 (Bankr. S.D. Ohio 1999).

creditors."[100] Plaintiff's Summary Judgment Motions as to Regions Twelfth Affirmative Defense address only the common enterprise doctrine.

For the reasons outlined above in connection with its analysis on Count IV, the Court will grant the Summary Judgment Motions as to the common enterprise doctrine set forth in Regions' Twelfth Affirmative Defense. The Court has not addressed the other issues raised by Regions in its Twelfth Affirmative Defense, except to the extent that the Court has already ruled upon them (*e.g.*, the good-faith defense).

## VII.   CONCLUSION

For the foregoing reasons, the Court finds it appropriate to grant Plaintiff's Motions for Partial Summary Judgment in part and to deny them in part. Accordingly, it is

**ORDERED:**

1.     Summary judgment is DENIED in part as to Count IV and GRANTED in part. The Court finds that Plaintiff has established the existence of a creditor prior to the date of the Subject Transfers.

2.     Summary judgment is DENIED as to Count VII.

3.     Summary judgment is GRANTED on the issue of good faith asserted by Regions in its Ninth Affirmative Defense as it relates to the Subject Transfers.

4.     Summary judgment is GRANTED as to Regions' Twelfth Affirmative Defense to the extent set forth in this Order.

The Clerk shall serve interested parties via CM/ECF.

---

[100] Adv. Pro. No. 8:15-ap-00117-CED, Doc. No. 15; Adv. Pro. No. 8:15-ap-00122-CED, Doc. No.15; Adv. Pro. No. 8:15-ap-00123-CED, Doc. No. 15; Adv. Pro. No. 8:15-ap-00124-CED, Doc. No. 15.