ORDERED.

**Dated:  July 18, 2018**

_Caryl E. Dellano_
Caryl E. Delano
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No. 8:11-bk-01927-CED
                                                          Chapter 7
FRANK MICHAEL MONGELLUZZI,

        Debtor.
_____/

ANGELA WELCH,

        Plaintiff,

vs.                                                       Adv. Pro. No. 8:14-ap-653-CED


REGIONS BANK,

        Defendant.

_____/

**MEMORANDUM OPINION AND ORDER GRANTING IN PART**
**DEFENDANT REGIONS BANK'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**
**(Doc. Nos. 428 and 476)**

        Defendant Regions Bank ("Regions") has filed two factually and legally intertwined motions

for partial summary judgment as to various counts of Plaintiff's Second Amended Complaint.[1] For

_____

[1] Doc. Nos. 428, 476.

the reasons that follow, the Court will grant the motions as to Plaintiff's constructive fraudulent transfer claims and will grant the motions in part as to Plaintiff's actual fraudulent transfer claims.

## I.   BACKGROUND

The basic facts are not in dispute. Together, Debtor Frank Mongelluzzi ("Debtor") and his wife Anne Mongelluzzi owned about 100 corporations and limited liability companies (the "Mongelluzzi Entities"). The Mongelluzzi Entities engaged in numerous diverse businesses, including a restaurant,[2] pawn shops,[3] a movie theatre,[4] airplane ownership,[5] and temporary staffing to the construction and construction-related industries.[6]

Debtor, Anne Mongelluzzi, and the Mongelluzzi Entities maintained 61 bank accounts at Regions (the "Mongelluzzi Accounts").[7] Two of the Mongelluzzi Accounts, Account Nos. 4648 and 9671, belonged to Debtor and Anne Mongelluzzi. Regions also had a significant lending relationship with the Mongelluzzis and the Mongelluzzi Entities, including a revolving credit line (the "Revolver"), with an original balance of $7.5 million (the "Regions Loans").[8] Debtor personally guaranteed the Revolver and was obligated to Regions on two of the Regions Loans.[9]

On June 28, 2010, Regions' fraud prevention department flagged some of the Mongelluzzi Accounts as suspicious for a possible check-kiting scheme.[10] That same day, the fraud prevention

---

[2] Main Case, Doc. No. 538.

[3] Main Case, Doc. No. 365.

[4] Cecil B. DeBoone, LLC, Case No. 8:13-bk-06883-CED.

[5] Mr. Excitement, LLC, Case No. 8:10-bk-27459-CED; FM Aviation II, LLC, Case No. 8:10-bk-24832-CED.

[6] *See, e.g.*, Able Body Temporary Services, Inc., Case No. 8:13-bk-06864-CED; YJNK II, Inc., Case No. 8:13-bk-06869-CED; Rotrpick, LLC, Case No. 8:13-bk-06894-CED.

[7] Doc. No. 156, ¶ 12.

[8] Doc. No. 156, ¶ 17.

[9] Doc. No. 480, Exh. D, E, and F (filed under seal pursuant to *Order Granting Regions Bank's Motion to Seal Exhibits to Region Bank's Motion for Partial Summary Judgment on Claims Asserted by Trustee Angela Welch*, Doc. No. 445).

[10] Heren_00304166 to Heren_00304199 (filed under seal pursuant to the *Amended Confidentiality Protective Order*, Doc. No. 282).

department sent an email to Regions' management notifying them of the suspicious activity.[11] Two days later, on June 30, 2010, Regions' monitoring and reporting operations department confirmed the fraudulent check-kiting activity.[12] Regions' investigation revealed that within the six days prior to June 30, 2010, suspect deposits totaling $6,065,702.30 had been made to the Mongelluzzi Accounts.[13] This Court has found that Regions had actual knowledge of the check-kiting scheme as of at least June 28, 2010.[14]

In early July 2010, Regions froze all the Mongelluzzi Accounts.[15] Regions then entered into a forbearance agreement (the "Forbearance Agreement") with the Mongelluzzis and some of the Mongelluzzi Entities. Shortly thereafter, Regions set off millions of dollars on deposit in the Mongelluzzi Accounts—including funds in accounts of Mongelluzzi Entities that were not obligated on the Regions Loans—to the outstanding balances on the Regions Loans.[16]

The Mongelluzzi Entities also maintained 77 bank accounts at Synovus Bank ("Synovus") and had loans with Synovus.[17] When Regions froze the Mongelluzzi Accounts in July 2010, Regions returned to Synovus numerous checks drawn on the Mongelluzzi Accounts that had been deposited to accounts at Synovus, resulting in $15 million in overdrafts in the Synovus accounts.[18]

### A.    The Bankruptcy Filings and Commencement of the Adversary Proceedings

In 2011, Debtor filed a voluntary Chapter 11 case and shortly thereafter converted the case to a Chapter 7. Plaintiff was appointed as the Chapter 7 trustee. In January 2014, Plaintiff commenced

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *See Memorandum Opinion Granting in Part and Denying in Part [Trustee Herendeen's] Motion for Partial Summary Judgment*, Doc. No 577.

[15] Doc. No. 156, ¶ 37.

[16] *Id.*

[17] Adv. Pro. No. 8:14-ap-645-CED, Doc. No. 1, pp. 4-5.

[18] Doc. No. 494, pp. 9-10; *Memorandum Opinion Granting in Part and Denying in Part [Trustee Herendeen's] Motion for Partial Summary Judgment*, Doc. No 577.

this adversary proceeding by filing a complaint against Regions in the United States District Court, Middle District of Florida, Case No. 14-cv-188-EAK-TGW. The District Court referred the case to this Court.[19] On April 7, 2016, Plaintiff filed her second amended complaint (the "Complaint").[20]

Meanwhile, in May 2013, Plaintiff filed Chapter 7 cases for sixteen of the Mongelluzzi Entities (the "Corporate Cases"). Christine Herendeen was appointed as the Chapter 7 Trustee in the Corporate Cases. In January 2015, Trustee Herendeen filed complaints against Regions in 14 of the Corporate Cases seeking, *inter alia*, to avoid fraudulent transfers arising from the Forbearance Agreement and subsequent transfers of funds to Regions.[21]

In November 2016, the pending adversaries against Regions were consolidated for administrative and discovery purposes only, with this adversary proceeding (8:14-ap-653-CED) serving as the lead adversary proceeding.[22] On July 2, 2018, the Court entered an order terminating the joint administration.[23]

Plaintiff and Trustee Herendeen also filed complaints against Synovus to avoid and recover alleged fraudulent transactions relating to Debtor and the Corporate Cases.[24] This Court approved the settlement of the claims against Synovus.[25]

---

[19] Doc. No. 31.

[20] Doc. No. 156.

[21] Adv. Pro. Nos. 8:15-ap-111-CED; 8:15-ap-112-CED; 8:15-ap-113-CED; 8:15-ap-114-CED; 8:15-ap-115-CED; 8:15-ap-116-CED; 8:15-ap-117-CED; 8:15-ap-118-CED; 8:15-ap-119-CED; 8:15-ap-120-CED; 8:15-ap-121-CED; 8:15-ap-122-CED; 8:15-ap-123-CED; 8:15-ap-124-CED; 8:15-ap-125-CED; and 8:15-ap-126-CED.

[22] *Order Consolidating Adversary Proceedings for Administrative and Discovery Purposes Only* (Doc. No. 200).

[23] Doc. No. 587.

[24] Adv. Pro. Nos. 8:14-ap-645-CED; 8:14-ap-972-CED; 8:14-ap-973-CED; 8:14-ap-974-CED; 8:14-ap-975-CED; 8:14-ap-976-CED; 8:14-ap-977-CED; 8:14-ap-978-CED; 8:15-ap-102-CED; 8:15-ap-103-CED; 8:15-ap-104-CED; 8:15-ap-105-CED; 8:15-ap-106-CED; 8:15-ap-107-CED; 8:15-ap-108-CED; 8:15-ap-109-CED; and 8:15-ap-110-CED.

**B.**    *Plaintiff's Claims for Relief and Regions' Counterclaim*

Plaintiff alleges that the Mongelluzzi Accounts and the Revolver were used to orchestrate a massive check-kiting scheme between 2007 and 2010;[26] that Regions had knowledge of the check-kiting scheme; and that Regions allowed the scheme to go on for years so that Regions could collect substantial fees, charges, interest, and other forms of revenue.[27] Plaintiff further alleges that Regions had actual knowledge of Debtor's intent to hinder and/or delay creditors by virtue of significant circumstantial evidence. This alleged circumstantial evidence includes the Mongelluzzis' and Mongelluzzi Entities' pattern of writing checks on accounts without sufficient available balances to cover the checks; chronically overdrawn accounts, including $1.7 million in overdrafts during the May to August 2010 time period; sales of Mongelluzzi Entities' accounts receivable; cash flow issues; and overly leveraged financial condition, etc.[28]

Plaintiff seeks to avoid and recover three different types of transfers to Regions as fraudulent transfers under Chapter 726 of the Florida Statutes, the Florida Uniform Fraudulent Transfer Act, 11 U.S.C. § 548, and other applicable provisions of the Bankruptcy Code. The three types of transfers are described by Plaintiff as the "Overdraft Loan Repayment Transfers," the "Deposit Transfers," and the "Other Loan Repayment Transfers"[29] (collectively, the "Transfers)."

---

[25] Orders approving global settlement of all adversaries against Synovus Bank, with Synovus Bank to pay $9,000,000.00 to the Trustees (Case No. 8:11-bk-01927-CED, Doc. No. 1791; Case No. 8:13-bk-06864-CED, Doc. No. 195; Case No. 8:13-bk-06866-CED, Doc. No. 187; Case No. 8:13-bk-06867-CED, Doc. No. 178; Case No. 8:13-bk-06868-CED, Doc. No. 169; Case No. 8:13-bk-06869-CED, Doc. No. 179; Case No. 8:13-bk-06875-CED, Doc. No. 175; Case No. 8:13-bk-06879-CED, Doc. No. 139; Case No. 8:13-bk-06881-CED, Doc. No. 176; Case No. 8:13-bk-06883-CED, Doc. No. 128; Case No. 8:13-bk-06888-CED, Doc. No. 130; Case No. 8:13-bk-06891-CED, Doc. No. 187; Case No. 8:13-bk-06894-CED, Doc. No. 177; Case No. 8:13-bk-06896-CED, Doc. No. 129; Case No. 8:13-bk-06897-CED, Doc. No. 170; Case No. 8:13-bk-06899-CED, Doc. No. 168; and Case No. 8:13-bk-06902-CED, Doc. No. 131).
[26] Doc. No. 156, ¶¶ 12 through 27.
[27] Doc. No. 156, ¶ 30.
[28] Doc. No 156, ¶¶ 28 and 29.
[29] Doc. No. 156, ¶¶ 49, 50, and 51.

*(1)     The Overdraft Loan Repayment Transfers*

Plaintiff alleges that Overdraft Loan Repayment Transfers were payments by Debtor to Regions to repay overdrafts in his accounts ("Overdrafts") in the amount of $1,229,374.38. The Overdraft Loan Repayment Transfers are summarized on Exhibit 9 to the Complaint as follows:[30]

| Acct. No. | Date of Overdraft | Date of Repayment | Amount |
|---|---|---|---|
| 4648 | 2/17/10 | 2/18/10 | $123,885.34 |
| 4648 | 2/24/10 | 2/25/10 | $423,885.34 |
| 4648 | 04/02/10 | 04/05/10 | $37,528.88 |
| 4648 | 04/23/10 | 04/26/10 | $213,561.88 |
| 4648 | 04/27/10 | 04/28/10 | $107,596.88 |
| 4648 | 05/13/10 | 05/17/10 | $251,893.28 |
| 4648 | 05/19/10 | 05/20/10 | $71,022.78 |
| Total | | | $1,229,374.38 |

Plaintiff does not allege any Overdrafts in Account No. 9671.

*(2)     The Deposit Transfers*

Plaintiff alleges that the Deposit Transfers consist of $12,893,805.97 deposited into Debtor's Regions' bank accounts in the four-year period preceding the filing of his bankruptcy petition. The Deposit Transfers are summarized in Exhibit 10 to the Complaint as follows:[31]

| Account No. | Statement Date | Deposit Amount |
|---|---|---|
| 4648 | 1/1/09-3/31/09 | $743,633.25 |
| 4648 | 5/1/09-5/29/09 | $400,000.00 |
| 4648 | 1/30/10-2/26/10 | $1,275,547.00 |
| 4648 | 2/27/10-3/31/10 | $2,081,655.24 |
| 4648 | 4/1/10-4/30/10 | $1,763,000.00 |
| 4648 | 5/1/10-5/28/10 | $2,192,987.97 |
| 4648 | 5/29/10-6/30/10 | $3,937,882.51 |
| 9671 | 8/12/08-9/10/08 | $500,000.00 |
| Total | | $12,893,805.97 |

---

[30] Doc. No. 156, Exh. 9. Exhibit 9 includes a footnote that, as of the date of the report (filed with the Court on April 7, 2016), Plaintiff had not received Regions' bank statements for the periods February 2, 2007 through June 10, 2008.

[31] Doc. No. 156, Exh. 10. Likewise, Exhibit 10 includes a footnote that, as of the date of the report (filed with the Court on April 7, 2016), Plaintiff had not received Regions' bank statements for the periods February 2, 2007 through June 10, 2008.

*(3)*    ***The Other Loan Repayment Transfers***

The Other Loan Repayment Transfers are transfers to Regions, in amounts that Plaintiff has not alleged, made to repay Debtor's outstanding loan obligations in the four-year period preceding the filing of his bankruptcy.

*(4)*    ***Summary of the Counts of the Complaint***

The following summary of Plaintiff's claims for relief as set forth in the Complaint may assist in understanding the counts of the Complaint to which the Motions are addressed:

Avoidance of the Transfers as actual fraud under § 726.105(1)(a)[32]

| | |
|---|---|
| Count I | Overdraft Loan Repayment Transfers |
| Count IV | Deposit Transfers |
| Count VII | Other Loan Repayment Transfers |

Avoidance of the Transfers as constructive fraud under § 726.105(1)(b)

| | |
|---|---|
| Count II | Overdraft Loan Repayment Transfers |
| Count V | Deposit Transfers |
| Count VIII | Other Loan Repayment Transfers |

Avoidance of the Transfers as constructive fraud under § 726.106(1)

| | |
|---|---|
| Count III | Overdraft Loan Repayment Transfers |
| Count VI | Deposit Transfers |
| Count IX | Other Loan Repayment Transfers |

Avoidance of the Transfers as actual fraud under 11 U.S.C. § 548(a)(1)(A)

| | |
|---|---|
| Count X | Overdraft Loan Repayment Transfers |
| Count XII | Deposit Transfers |
| Count  XIV | Other Loan Repayment Transfers |

---

[32] To the extent that Plaintiff seeks to avoid transfers under Chapter 726, Florida Statutes, the Florida Uniform Fraudulent Transfer Act, she does so by operation of 11 U. S. C. § 544(b). Unless otherwise stated, statutory references are to the Florida Statutes.

<u>Avoidance of the Transfers as constructive fraud under 11 U.S.C. § 548(a)(1)(B)</u>

Count XI        Overdraft Loan Repayment Transfers
Count XIII      Deposit Transfers
Count  XV       Other Loan Repayment Transfers

Plaintiff's final count, Count XVI, seeks the recovery of avoided Transfers under 11 U.S.C. § 550.

### (5)    *Regions' Counterclaim*

Regions filed a counterclaim against Plaintiff and Trustee Herendeen, seeking an accounting of the claims asserted by them.[33] This ruling addresses only Plaintiff's claims as asserted in the Complaint.

### C.    *Regions' Motions for Partial Summary Judgment*

Regions has filed two separate motions for partial summary judgment[34] (together, the "Motions").

The first motion for partial summary judgment ("First Motion") is directed to Plaintiff's claims to avoid the Deposit Transfers as both actual and constructive fraudulent transfers (Counts IV, V, VI, XII, and XIII of the Complaint) and to avoid the Other Loan Repayment Transfers as constructive fraudulent transfers (Counts VIII, IX, and XV of the Complaint). In its second motion for partial summary judgment ("Second Motion"), Regions addresses Plaintiff's claims to avoid the Overdraft Loan Repayment Transfers as constructive fraudulent transfers (Counts II, III, and XI of the Complaint). The Motions both seek partial summary judgment under Count XVI, Plaintiff's claim to recover avoided Transfers under 11 U.S.C. § 550.[35]

---

[33] Doc. No. 160, pp. 27-30.

[34] Doc. Nos. 428 and 476.

[35] Regions has *not* moved for summary judgment on Counts I and VII of the Complaint (avoidance of the Overdraft Loan Repayment Transfers and Other Loan Repayment Transfers as actual fraud under § 726.105(1)(a)) or on Counts X and XIV of the Complaint (avoidance of Overdraft Loan Repayment Transfers and Other Loan Repayment Transfers as actual fraud under 11 U.S.C. § 548(a)(1)(A)).

The Court recognizes, as Plaintiff has pointed out, that the issues of law presented in the Motions were previously raised in Regions' motion to dismiss an earlier iteration of the Complaint, which this Court denied in November 2014.[36] However, this Court's ruling on Regions' motion to dismiss was made in consideration of the District Court's denial of a similar motion to dismiss Trustee Herendeen's complaint filed by Synovus in one of Corporate Cases.[37] The District Court's ruling was, in part, because Synovus' motion was filed in the early stages of the case; the ruling was without prejudice to Synovus' raising the issues anew on summary judgment.[38]

The record in this adversary proceeding reflects that during the three and one-half years since the Court ruled on Regions' motion to dismiss, Plaintiff and Regions have engaged in extensive factual discovery that Plaintiff could use, if relevant, to oppose the Motions.

## II.    ANALYSIS

### A.    *Summary Judgment Standard*

Under Federal Rule of Civil Procedure 56, incorporated by Federal Rule of Bankruptcy Procedure 7056, a moving party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[39] A factual issue is genuine if the evidence is such that the fact finder could return a verdict for the nonmovant. Facts are material if, under applicable law, they would affect the outcome of the suit.[40]

The court in *In re Fields*,[41] citing to the Eleventh Circuit Court of Appeals' ruling in *Fitzpatrick v. City of Atlanta*,[42] succinctly summarized the analysis of the burdens of the moving and non-moving parties on summary judgment. For issues on which the movant bears the burden of

---

[36] Doc. Nos. 40 and 55.
[37] Transcript, Doc. No. 52, pp. 9-12.
[38] Welch v. Synovus Bank, Adv. Pro. No. 8:14-ap-645-CED, Doc. No. 45.
[39] Fed. R. Civ. P. 56(a).
[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[41] 2018 WL 1616840, at *2 (Bankr. M.D. Fla. Mar. 30, 2018).
[42] 2 F.3d 1112, 1116 (11th Cir. 1993).

proof, the movant must come forward with credible evidence that would entitle the movant to a directed verdict, if not controverted at trial. But for issues on which the nonmovant bears the burden at trial, the moving party may either show that there is an absence of evidence to support the non-moving party's claim or may come forward with affirmative evidence showing that the non-moving party will be unable to prove its claim or defense at trial. If the moving party carries its initial burden, the responsibility moves to the non-moving party to show the existence of a genuine issue of material fact.[43]

If the movant meets it burden, then the nonmovant's burden depends upon how the movant's burden was met. If the movant put on affirmative evidence, then the nonmovant must respond with evidence sufficient to withstand a motion for directed verdict.[44] If the movant pointed to the absence of evidence supporting the nonmovant's claim or defense, the nonmovant must either show that the movant overlooked or ignored evidence in the record that would withstand a motion for directed verdict, or come forward with sufficient evidence to withstand a motion for directed verdict.[45]

Here, Plaintiff bears the burden of proof at trial to establish each element of her fraudulent transfer and recovery claims. Therefore, as the moving party on summary judgment, Regions has the burden to show that there is an absence of record evidence to support Plaintiffs' case or to show affirmative evidence that Plaintiff will be unable to prove her claims. Although Plaintiff argues that the Motions are not supported by affidavits, Regions relies on Plaintiff's own exhibits to the Complaint to meet its burden.

---

[43] 2 F.3d at 1115-1116; *In re Fields*, 2018 WL 1616840, at *2.

[44] *In re Fields*, 2018 WL 1616840, at *2 and *3.

[45] *Id*. at *3.

### B.    Nature of a Check-Kiting Scheme

The bankruptcy court in *In re Montgomery*[46] described the activities that constitute a check-kiting scheme:

> Check kiting is a form of fraud which creates unauthorized loans between a bank and its customer. As explained in a leading treatise:
>
>> The kite is a type of fraud by which the malefactor uses at least two accounts at separate banks and covers overdrafts on one bank by writing overdrafts on the other bank. The malefactor takes advantage of the float period between the moment of deposit and the moment of payment by each drawee bank. He also takes advantage of both banks' willingness to pay checks drawn against uncollected funds . . .
>>
>> A constant flow of worthless checks between the two accounts keeps the kite alive as the numbers grow larger and larger. . . .
>>
>> [T]he kite usually continues until one of the two banks refuses to honor checks drawn against uncollected funds . . .
>
> In its footnotes to *Williams v. United States,* 458 U.S. 279, 281 n. 1, 102 S.Ct. 3088, 3089–90 n. 1, 73 L.Ed.2d 767 (1982) the Supreme Court gave this typical example:
>
>> "The check kiter opens an account at Bank A with a nominal deposit. He then writes a check on that account for a large sum, such as $50,000. The check kiter then opens an account at Bank B and deposits the $50,000 check from Bank A in that account. At the time of deposit, the check is not supported by sufficient funds in the account at Bank A. However, Bank B, unaware of this fact, gives the check kiter immediate credit on his account at Bank B. During the several-day period that the check on Bank A is being processed for collection from that bank, the check kiter writes a $50,000 check on his account at Bank B and deposits it into his account at Bank A. At the time of the deposit of that check, Bank A gives the check kiter immediate credit on his account there, and on the basis of that grant of credit pays the original $50,000 check when it is presented for collection.
>>
>> By repeating this scheme, or some variation of it, the check kiter can use the $50,000 credit originally given by Bank B as an interest-free loan for an extended period of time. In effect, the

---

[46] 123 B.R. 801, 807-808 (Bankr. M.D. Tenn. 1991).

> check kiter can take advantage of the several-day period required for the transmittal, processing, and payment of checks from accounts in different banks...."

Innumerable federal cases beginning with the often-cited decision of the Seventh Circuit in *Federman v. United States,* 36 F.2d 441 (7th Cir. 1929), *cert. denied,* 281 U.S. 729, 50 S.Ct. 246, 74 L.Ed. 1146 (1930) recognize that **check kiting is a scheme to defraud a bank through the creation of unauthorized loans or credits.**[47]

Many court decisions involving check-kiting schemes arise in the context of criminal cases. The bank left holding dishonored checks is the victim of the scheme as it is the bank who suffers the loss – not the creditors of the check-kiter.[48] For example, in *United States v. Marker,*[49] the court held

> In a check kiting scheme, where the offender writes bad checks to "temporarily ... obtain credit," Black's Law Dictionary 238 (6th ed. 1990), **the amount of money owed to the victim banks at the time the kite is detected is the value of the money unlawfully taken by the defendant.** In effect, the gross amount of the kite at the time of detection, less any other collected funds the defendant has on deposit with the bank at that time and any other offsets that the bank can immediately apply against the overdraft (including immediate repayments), is the loss to the victim bank.[50]

Here, Plaintiff alleges that in the summer of 2010, Regions returned to Synovus numerous checks drawn on the Mongelluzzi Accounts that had been deposited to accounts at Synovus, resulting in $15 million in overdrafts in the Synovus accounts.[51]

###### C.    *Plaintiff's Constructive Fraudulent Transfer Claims under § 726.105(1)(b), § 726.106(1), and 11 U.S.C. § 548(a)(1)(B)*

Regions has moved for partial summary judgment on each of Plaintiff's constructive fraudulent transfer claims.

---

[47] *Id.* at 807-808 (emphasis supplied) (internal citations omitted).
[48] *See, e.g. United States v. Asher*, 59 F.3d 622 (7th Cir. 1995); *United States v. Rackley*, 986 F.2d 1357, 1361 (10th Cir. 1993).
[49] 871 F. Supp. 1404 (D. Kan. 1994).
[50] *Id.* at 1409.
[51] Doc. No. 494, p. 10.

Under § 726.105(1)(b), a transfer is fraudulent as to present or future creditors if the debtor made the transfer without receiving a reasonably equivalent exchange of value and the debtor (1) was engaged, or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

Under § 726.106(1), a transfer is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation. Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.[52]

Under 11 U.S.C. § 548(a)(1)(B), a transfer is constructively fraudulent if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation; and was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . ." The Bankruptcy Code defines value as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ."[53] In determining whether reasonably equivalent value was given the court must determine the value of what was transferred and compare it to what was received.[54]

---

[52] Fla. Stat. § 726.104.

[53] 11 U.S.C. § 548(d)(2)(A).

[54] *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 254 (Bankr. M.D. Fla. 2003).

Transfers are voidable under FUFTA if they took place within four years prior to the filing of the bankruptcy petition,[55] while transfers under 11 U.S.C. § 548 are voidable if they occurred within two years prior to the filing of the petition.[56]

The Court will analyze each of the types of Transfers to determine whether Plaintiff is able to prove the elements necessary to avoid the Transfers as being constructively fraudulent.

### (1)    The Deposit Transfers (First Motion, Counts IV, V, VI, XII, XIII, XVI)

The Deposit Transfers consist of $12,893,805.97 deposited into Debtor's two Regions' bank accounts in the four-year period preceding the filing of his bankruptcy petition.[57]

### (a)    Whether the Deposit Transfers Are "Transfers."

### (i)    Deposit Transfers that Are Unrelated to the Payment of Overdrafts Are Not Transfers Subject to Avoidance.

The threshold question in the First Motion is whether the Deposit Transfers qualify as "transfers" under FUFTA and the Bankruptcy Code such that they are subject to avoidance. Regions contends that, notwithstanding Plaintiff's definition of the Deposit Transfers as "transfers," the Deposit Transfers do not meet the statutory definitions of a "transfer."

Under FUFTA, the term "transfer" is defined as meaning

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.[58]

The Bankruptcy Code's definition of "transfer" is essentially the same.[59]

A line of cases holds that a customer's "regular deposits" into his own unrestricted bank accounts are not transfers within the meaning of the Bankruptcy Code.[60] Courts have held that the

---

[55] Fla. Stat. § 726.110.
[56] 11 U.S.C. § 548(a)(1).
[57] Doc. No. 156, Exh. 10.
[58] Fla. Stat. § 726.102(14).
[59] 11 U.S.C. § 101(54)(D).

deposits are not transfers because the customer is not "truly disposing" of the deposited funds, but instead retains "complete autonomy" and the "unfettered ability to withdraw" the deposited funds.[61]

The Deposit Transfers exceed the amount of the Overdrafts by $11,664,431.59. In fact, more than half of the Deposit Transfers were completely unrelated to Overdraft Loan Repayment Transfers as shown by a comparison of Plaintiff's list of the Overdraft Loan Repayment Transfers during the four-year period preceding the bankruptcy filing (Exhibit 9 to the Complaint) to the list of Deposit Transfers during that same time period (Exhibit 10 to the Complaint). The comparison below reflects that there were no Overdrafts at all during the following statement periods:

| Account No. | Statement Date | Deposit Amount |
|---|---|---|
| 4648 | 1/1/09-3/31/09 | $743,633.25 |
| 4648 | 5/1/09-5/29/09 | $400,000.00 |
| 4648 | 2/27/10-3/31/10 | $2,081,655.24 |
| 4648 | 5/29/10-6/30/10 | $3,937,882.51 |
| 9671 | 8/12/08-9/10/08 | $500,000.00 |
| Total | | $7,663,171.00 |

Plaintiff contends that the cases supporting Regions' position were decided in the context of Ponzi schemes—in which the debtors' banks had no knowledge of or participation in the debtors' fraudulent activity. But the issue here is whether Debtor had complete autonomy and unfettered ability to withdraw the deposited funds. Whether that autonomy and unfettered ability arose in the context of a Ponzi scheme or a check-kiting scheme does not change the analysis.

---

[60] *In re Whitley*, 848 F.3d 205, 208 (4th Cir. 2017); *Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1327-29 (M.D. Fla. 2015); *In re Rollaguard Security, LLC*, 570 B.R. 859 (Bankr. S.D. Fla. 2017). In the absence of case law defining the term, the Court turns to the dictionary. *The Law Dictionary* defines "regular" as "[a]ccording to rule; as distinguished from that which violates the rule or follows no rule. According to rule; as opposed to that which constitutes an exception to the rule or is not within the rule." *The Law Dictionary Featuring Black's Law Dictionary*, https://thelawdictionary.org/regular/ (last visited July 17, 2018). The most applicable definition provided by *Merriam-Webster* is "constituted, conducted, scheduled, or done in conformity with established or prescribed usages, rules, or discipline." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/regular (last visited July 17, 2018).

[61] *In re Rollaguard*, 570 B.R. at 872.

The Court finds that there are no factual issues regarding Plaintiff's summaries of Overdraft Loan Repayment Transfers and Deposit Transfers. To the extent that Deposit Transfers exceeded Overdrafts, $11,664,431.59, they were "regular deposits" and not "transfers" because Debtor had unfettered access to those funds.

> ### (ii)    *Deposit Transfers that Were Applied to Overdrafts Are Transfers Subject to Avoidance.*

Plaintiff contends that the $1,229,374.38 in Overdrafts were extensions of credit and that deposits made to repay those extensions of credit are avoidable as fraudulent transfers and recoverable by the Trustee.[62] Regions' own policies and procedures deem account overdrafts to be extensions of credit.[63]

Courts have held that deposits into a debtor's bank account that are used by the bank to cover overdrafts are transfers that may be avoided as preferences under 11 U.S.C. § 547. For example, in *In re Montgomery*,[64] the Sixth Circuit Court of Appeals held that the debtor had sufficient control over funds that he transferred between banks as part of a check-kiting scheme so that his deposits, which reduced overdrafts at one bank from over $2 million to zero within the 90 days prior to the debtor's bankruptcy petition, could be recovered by the trustee as a preferential transfer. The same rationale applies to the avoidance of a fraudulent transfer.

The Court finds that to the extent the Deposit Transfers were used by Regions to repay the extensions of credit Regions represented by the Overdrafts, the Court finds that a "transfer" occurred.

---

[62] Transcript, Doc. No. 478, p. 59, ll. 13-17.
[63] Doc. No. 452, p. 21 (filed under seal).
[64] 983 F.2d 1389 (6th Cir. 1993).

**(b)    Regions Is an "Initial Transferee" Only to the Extent that Deposit Transfers Were Applied to the Overdrafts.**

Regions next contends that even if the Deposit Transfers were "transfers" for avoidance purposes, those transfers may not be recovered because Regions was not an "initial transferee" of the transfer.

Under 11 U.S.C. § 550(a)(1), a transfer that has been avoided as a fraudulent transfer may be recovered from the "initial transferee of such transfer or the entity for whose benefit the transfer was made." In *Wiand v. Wells Fargo Bank, N.A.,* a Ponzi scheme case, the district court held the defendant bank was not an "initial transferee", stating that "[w]hen banks receive money for the sole purpose of depositing it into a customer's account . . . the bank never has actual control of the funds and is not a section 550 initial transferee."[65]

However, in *In re Harwell,*[66] the Eleventh Circuit analyzed the "initial transferee" issue in the context of whether the recipient of the transfer is a "mere conduit." The court reviewed a line of Eleventh Circuit cases on this issue, including the development of the conduit or control test. The court, citing to its decision in *IBT Int'l, Inc. v. Northern (In re Int'l Admin Servs., Inc.),*[67] stated:

> This Court observed [in IBT] that "[t]he determination whether a particular party is an 'initial transferee' within the meaning of § 550(a)(1) has not been as straightforward as the language itself might suggest. The *IBT* Court acknowledged that "[a] strictly literal interpretation of the statutory term would suggest that the 'initial transferee' of a transfer is the first party which received possession of the property in question after it left the hands of the debtor." We observed that the "courts are disinclined to construe the statute [§ 550(a)] in such a rigid manner" and "have created a more malleable approach to § 550(a)" which recognizes that a "'mere conduit' cannot be considered an 'initial recipient' for purposes of an avoidance action." We added that "[t]he mere conduit rule is used most frequently in situations where banks act as an intermediary in transferring assets."

---

[65] *Wiand*, 86 F. Supp. 3d at 1328 (citing *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988)).
[66] 628 F.3d 1312 (11th Cir. 2010).
[67] 408 F.3d 689 (11th Cir. 2005).

In explaining the conduit or control test, this Court in *IBT* eschewed the literal statutory language of § 550(a), saying that a rigid interpretation would be unfair "because in many instances the initial recipient may have nothing to do with the debtor's property other than facilitating its transfer." Banks and other intermediary institutions are to be shielded from § 550 liability "because [they] never exercised any control over the Debtor's funds."

After referring to the mere conduit rule as an "exception" to the statutory language, we explained that: "*As we read it, the conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud.*" (emphasis added).[68]

The *Harwell* court held that in most cases, funds transferred in and out of a lawyer's trust account, just like bank transfers, will be entitled to mere conduit status because the lawyer lacks control over the funds. But the court concluded in *Harwell* that the defendant attorney could not claim he was a mere conduit for funds transferred to his trust account because he had been involved in the debtor's scheme to use the funds to pay preferred creditors and insiders. The Eleventh Circuit stated:

> Consistent with our precedent, we conclude that good faith is a requirement under this Circuit's mere conduit or control test. Accordingly, initial recipients of the debtor's fraudulently-transferred funds who seek to take advantage of equitable exceptions to § 550(a)(1)'s statutory language must establish (1) that they did not have control over the assets received, i.e., that they merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that they acted in good faith and as an innocent participant in the fraudulent transfer.[69]

Here, Plaintiff contends that Regions was not the mere recipient of deposits to Debtor's accounts but, that Regions knowingly participated in Debtor's and the Mongelluzzis' check-kiting scheme over a period of years for its own gain. This Court has already found that Regions had actual knowledge of the check-kiting scheme as of at least June 28, 2010.[70] Here, Regions' knowledge of or involvement in the check-kiting scheme during the course of its banking and lending relationship

---

[68] 628 F.3d at 1320-1321 (citations omitted).
[69] *In re Harwell*, 628 F.3d at 1323.
[70] *See Memorandum Opinion Granting in Part and Denying in Part [Trustee Herendeen's] Motion for Partial Summary Judgment*, Doc. No 577.

with the Mongelluzzi Entities presents a genuine issue of material fact on the issue of whether it is an "initial transferee" as to the $1,229,374.38 of Overdrafts.

> **(c)** ***Even if the Deposit Transfers Are Transfers and Regions is an "Initial Transferee," Debtor Received Reasonably Equivalent Value.***

Regions contends that even if the Deposit Transfers are otherwise avoidable transfers, Debtor received reasonably equivalent value because:

> [I]f the deposit of one's funds into one's own demand deposit account constitutes a transfer at all, then the depositor always receives reasonably equivalent value, because the depositor has the unfettered ability to withdraw the same sum.[71]

This rationale certainly applies to funds that were deposited into Debtor's account and were not used to cover the Overdrafts. And to the extent that the Transfer Deposits were used to repay Overdrafts, the satisfaction of that indebtedness constitutes reasonably equivalent value. Section 726.104 and 11 U.S.C. § 548(d)(2) specifically define value as including satisfaction or securing of a present or antecedent debt of the debtor. The Court finds that dollar for dollar payment of Overdrafts constitutes reasonably equivalent value.

Because Debtor received reasonably equivalent value, either in the form of unfettered access to the Deposit Transfers or to the extent that the Deposit Transfers were used to pay Overdrafts, the Deposit Transfers are not subject to avoidance as constructive fraudulent transfers under FUFTA or 11 U.S.C. § 548.

> **(2)** ***The Overdraft Loan Repayment Transfers (Second Motion, Counts II, III, XI, and XVI)***

The Overdraft Loan Repayment Transfers are payments by Debtor to Regions to repay overdrafts in Debtor's accounts, totaling $1,229,374.38.[72] But as Regions points out, and as

---

[71] Doc. No. 428, p. 14, citing *In re Rollaguard Security, LLC*, 570 B.R. 859 (Bankr. S.D. Fla. 2017).
[72] Doc. No. 156, Exh. 9.

demonstrated by Exhibits 9 and 10 to the Complaint, the Overdraft Loan Repayment Transfers are included within the Deposit Transfers

As set forth above, the Court has found that if Deposit Transfers were not applied to Overdrafts (in other words, to the extent that the Deposit Transfers are not Overdraft Loan Repayment Transfers), the Deposit Transfers are not "transfers" subject to avoidance under FUFTA or 11 U.S.C. § 548 and Regions is not an "initial transferee." The Overdraft Loan Repayment Transfers themselves ($1,229,374.38) were "transfers" and, as to that amount, Regions is an "initial transferee." This leaves one remaining issue: whether Debtor received reasonably equivalent value in exchange for the Overdraft Loan Repayment Transfers.

Plaintiff's list of the Overdraft Loan Repayment Transfers she seeks to avoid (Exhibit 9 to the Amended Complaint) are in the exact amount of the Overdrafts; Plaintiff does not seek to recover related fees or costs, but seeks to recover only the principal of the amount of the "credit" that Regions extended to Debtor. But when the payment is for the principal amount of a loan, reasonably equivalent value is given.[73]

The court in *In re Petters Co., Inc.*,[74] recognized that where the overdraft loan repayments were made in the precise amount of the principal amount extended by the bank, and no fees or interest was paid, reasonably equivalent value was given. In *Petters*, the debtor was involved in a massive Ponzi scheme. The bankruptcy trustee sought to avoid and recover six transfers to a depository bank that had covered overdrafts on the debtor's accounts on the theory that the transfers were payments on short-term loans.

In other words, in *Petters*, as in the facts presented here, the bank would honor a check when the debtor's account had insufficient funds to cover the check by making a short-term "loan." When

---

[73] *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011).
[74] 548 B.R. 551, 565-69 (Bankr. D. Minn. 2016).

the debtor deposited funds into the account to cover the check, the bank would apply those funds to the negative balances in the account in the exact amount of the short-term credit extended. In granting the depository bank's motion to dismiss for failure to state a claim, the *Petters* court found that the repayment of a negative account balance was tantamount to the repayment of a principal indebtedness and that the trustee's complaint failed to establish the element of reasonably equivalent value.

As in *Petters*, Plaintiff alleges that the Overdrafts were loans and has not moved to recover any interest or fees associated with the Overdrafts. Therefore Debtor's repayment of the principal of the loans to Regions in amounts that are exactly equal to the amount of principal it received constitute reasonably equivalent value.

If Plaintiff were suing Regions to recover Overdraft Loan Repayment Transfers made within the 90-day period prior to Debtor's bankruptcy petition as preferential transfers under 11 U.S.C. § 547, Plaintiff would likely prevail.[75] But under FUFTA and 11 U.S.C. § 548, a constructively fraudulent transfer may be avoided only if the debtor received less than reasonably equivalent value. Here, the Overdraft Loan Repayment Transfers are the satisfaction of indebtedness and constitute reasonably equivalent value, which is not an issue in preference actions.

Although Plaintiff argues that that dismissal of constructive fraudulent transfer claims is improper as a matter of law, relying upon *Welch v. Highlands Union Bank*,[76] that case was decided at the pleading stage of the litigation on a motion for judgment on the pleadings. On a motion for judgment on the pleadings, the court is "obligated to accept all well-pleaded facts and construe those facts in the light most favorable to the pleader." *Highlands Union Bank* arose under similar facts—Plaintiff sought to recover deposits to Debtor's accounts to cover $1.2 million in

---

[75] *See In re Sophisticated Communications, Inc.*, 369 B.R. 689 (Bankr. S.D. Fla. 2007); *In re Agriprocessors, Inc.*, 490 B.R. 852 (Bankr. N.D. Iowa 2013).

[76] 526 B.R. 152 (D. W.Va. 2015).

overdrafts—but, unlike this adversary proceeding, the court's ruling was early in the case and without the benefit of discovery.

> *(3)* ***The Other Loan Repayment Transfers (First Motion, Counts VIII, IX, XV, XVI)***

In its reply brief,[77] Regions brought to the Court's attention that Plaintiff's response to the First Motion did not address the issue of the Other Loan Repayment Transfers. At oral argument, the only argument that Plaintiff's counsel made regarding the Other Loan Repayment Transfers was this statement:

> Also, Regions has not moved for partial summary judgment on Trustee Welch's actual intent claims on the other loan repayment transfers, meaning absent another motion for partial summary judgment on that claim, that claim is going to go to trial.[78]

Accordingly, the Court considers Region's request for partial summary judgment on the Other Loan Repayment Transfers to be unopposed.

> **D.    *Plaintiff's Actual Fraud Claims and § 726.105(1)(a), and § 548(a)(1)(A) (First Motion, Counts IV, XII)***

Regions seeks summary judgment on Count IV and XII, Plaintiff's claims to avoid the Deposit Transfers as actual fraud under § 726.105(1)(a) and 11 U.S.C. § 548(a)(1)(A).

Under § 726.105(1)(a), a transfer made by a debtor is fraudulent as to either a present or future creditor if the transfer was made with the "actual intent to hinder, delay, or defraud any creditor of the debtor." Likewise under 11 U.S.C. § 548(a)(1)(A), the trustee may avoid a transfer made with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted.

---

[77] Doc. No. 454.
[78] Transcript, Doc. No. 478, p. 66, l. 23 to p. 67, l. 2.

In order to establish a prima facie case of actual fraud a plaintiff must prove that there was a creditor to be defrauded, there was a transfer of property, and there was a debtor intending fraud.[79]

Regions' argument with respect to Counts IV and XII is limited to its contention that the Deposit Transfers are not "transfers" subject to avoidance and that Regions is not an "initial transferee." As set forth in the Court's analysis of Plaintiff's constructive fraudulent transfer claims, above, the Court has found that to the extent that Deposit Transfers were not applied to Overdrafts, they were not transfers within the meaning of FUFTA or the Bankruptcy Code, but to the extent Deposit Transfers were applied to Overdrafts, they were "transfers." Similarly, the Court found that Regions is an "initial transferee" only to the extent that the Deposit Transfers were applied to the Overdrafts.

Therefore the only issue remaining on Plaintiff's actual fraud claim with respect to Deposit Transfers that were applied to Overdrafts is whether those deposits were made with "actual intent to hinder, delay, or defraud any creditor of the debtor." Regions has presented no evidence on this issue. Therefore, the Court will deny the Motions to the extent that the Deposit Transfers would otherwise be recoverable, *i.e.*, to the extent applied to Overdrafts in the amount of $1,229,374.38.

### E.      *Plaintiff's Recovery Claim (First and Second Motions, Count XVI)*

11 U.S.C. § 550 provides for the recovery by a trustee of claims that are avoided under, *inter alia*, §§ 544(b) and 548. To the extent that the Court has granted summary judgment in Regions' favor on Plaintiff's avoidance claims, partial summary judgment as to Count XVI is appropriate.

### F.      *Regions' Alleged Lack of Good Faith Does Not Preclude Entry of Summary Judgment.*

Plaintiff argues that summary judgment is not appropriate given the fact-intensive nature of reasonably equivalent value in cases like this, particularly on the issue of good faith. Plaintiff cites

---

[79] *Branch Banking & Trust Co. v. Hamilton Greens, LLC*, 2016 WL 3365270, at *8 (S.D. Fla. Jan. 13, 2016).

*Welch v. Highlands Union Bank*,[80] where the court explained that reasonably equivalent value is determined by a variety of factors including the good faith of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length.

But as the Eleventh Circuit explained in *In re Caribbean Fuels America, Inc.*,[81] while these factors may apply where the purported benefits to the debtor are indirect, they do not apply where the debtor directly received the benefit of the transfer at issue. The court noted that:

> This framework [the factors of good faith, disparity in value, and whether the transaction was arm's length] may apply where the purported benefits to the debtor are indirect. But in cases like this one, where the debtor directly received property, goods, or services as a result of the transfers at issue, that test cannot be squared with *Federated Title's* demand that "value" be measured by the objective "value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."[82]

The Court finds that although reasonably equivalent value may in certain cases be a factual determination, here, Debtor directly received dollar for dollar credit for the Overdraft Loan Repayment Transfers. By definition, dollar for dollar credit is reasonably equivalent value.

### G.    Regions' Counterclaim and Defenses in Another Action Do Not Preclude This Court's Grant of Summary Judgment.

Plaintiff argues that judicial estoppel precludes summary judgment because Regions asserted a counterclaim against Plaintiff and Trustee Herendeen as to the ownership of the funds on deposit in the Mongelluzzi Accounts[83] and because Regions has asserted alternate legal theories in defending Trustee Herendeen's claims against it in the Corporate Cases.[84]

---

[80] 526 B.R. 152 (D. W.Va. 2015).
[81] 688 F. App'x 890, 895 (11th Cir. 2017).
[82] *Id.* at 895 n.3 (citing *In re Financial Federated Title & Trust, Inc.*, 308 F.3d 1325, 1332 (11th Cir. 2002)).
[83] Doc. No. 494.
[84] Doc. No. 512, pp. 3-6.

But judicial estoppel does not apply here; it applies when a party asserts a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.[85] In the Eleventh Circuit, courts are directed to examine two factors when deciding whether judicial estoppel is applicable:  "first, it must be established that the allegedly inconsistent positions were made under oath in a prior proceeding; and second, the inconsistencies must have been calculated to make a mockery of the judicial system."[86]

Here, Plaintiff alleges that Debtor made deposits into his accounts, and that Debtor incurred Overdrafts and later paid Regions the amount of the Overdrafts. Regions does not dispute these factual allegations and merely argues, as a matter of law, that they do not give rise to avoidable fraudulent transfer claims. The fact that Regions' counterclaim raises the question of the entitlement or ownership of the funds on deposit does not contradict Regions' positions taken in its counterclaim or its defense to Trustee Herendeen's claims. And to the extent that Regions asserted alternate legal theories in its defense of Trustee Herendeen's fraudulent transfer claims on the issue of reasonably equivalent value, this is merely a divergent legal position. Divergent legal positions do not warrant the application of judicial estoppel.[87]

### III.    CONCLUSION

The Court finds, as a matter of law, that to the extent that Deposit Transfers were not applied to Overdrafts, the Deposit Transfers were not "transfers" subject to avoidance under FUFTA or 11 U.S.C. § 548 and Regions is not an "initial transferee." However, to the extent that Deposit Transfers were applied to Overdrafts, they were "transfers" and Regions is an "initial transferee." But even if

---

[85] *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 (11th Cir. 2002).

[86] *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005) (citing *Burnes*, 291 F.3d at 1285).

[87] *The Pittston Co. v. United States*, 199 F.3d 694, 701 n.4 (4th Cir. 1999) ("Judicial estoppel applies only to the making of inconsistent statements of fact, and therefore is of no relevance to [the litigant's] legal contention[.]").

the Deposit Transfers were "transfers" and Regions is an "initial transferee," the Deposit Transfers, whether or not applied to Overdrafts, were for reasonably equivalent value.

Therefore, on Plaintiff's claims to avoid the Transfers as constructively fraudulent transfers (Counts II, III, V, VI, VIII, IX, XI, XIII, XV), the Court finds that Regions, as the moving party, has met its burden by pointing out the absence of evidence to support Plaintiff's claims, and that Plaintiff has failed to meet her burden to show that Regions overlooked or ignored evidence in the record that would withstand a motion for directed verdict or to come forward with sufficient evidence to withstand a motion for directed verdict.

On Plaintiff's claims to recover the Deposit Transfers as actual fraudulent transfers (Counts IV and XII), the Court finds, first, that the Deposit Transfers were "transfers" only to the extent that they were applied to Overdrafts and as to the amount of the Overdrafts, $1,229,374.38, Regions was an "initial transferee." The remaining issue is whether these transfers to Regions were made with the requisite intent to hinder, delay, or defraud; Regions has not met its summary judgment burden on this issue. Second, the Court finds that the remaining amount of the Deposit Transfers, $11,664,431.59, were not "transfers," and as to that amount of the Deposit Transfers, Regions was not an "initial transferee." Therefore, the Court will grant the Motions as to Counts IV and XII in part and deny in part.

And last, because Plaintiff's Count XVI recovery claim is dependent upon the underlying avoidance claims, the Court will grant the motion as to that claim in part.

For the foregoing reasons, the Court finds it appropriate to grant Plaintiff's Motions for Partial Summary Judgment in part. Accordingly, it is

**ORDERED:**

1.      Summary judgment is GRANTED in Regions' favor on Counts II, III, V, VI, VIII, IX, XI, XIII, and XV.

2.      Summary judgment GRANTED in part on Counts IV and XII as to that portion of the Deposit Transfers that were not applied to Overdrafts, $11,664,431.59, and DENIED as to that portion of the Deposit Transfers that were applied to Overdrafts, $1,229,374.38.

3.      Summary judgment is GRANTED in part and DENIED in part at to Count XVI, consistent with the foregoing rulings.

The Clerk of Court shall serve this order on the parties via CM/ECF.